STEELMAN, Judge.
On 29 August 2001 the Cabarrus County Department of Social Services (Social Services) took non-secure custody of M.C. and C.H. (the children, collectively) based on a petition alleging abuse and neglect of M.C. and neglect of C.H. On 14 March 2002 M.C. was adjudicated abused and neglected and C.H. was adjudicated neglected. At the disposition hearing Judge Johnson ordered that the permanent plan for the children be adoption based on her finding that attempting reunification with respondent within a reasonable time would be futile. A motion to terminate respondent's parental rights was filed 3 July 2002, and on 11 July 2003 Judge Johnson's orders terminating respondent's parental rights as to M.C. and C.H. were filed. In Judge Johnson's orders,she found the following relevant facts: 1) In July of 1999 respondent took C.H. to the hospital for a fever, that she became upset with hospital personnel and left with C.H. against doctor's recommendation, the sheriff's department was called and C.H. was returned to the hospital where he remained for three days; 2) there were incidents of domestic violence in the home between respondent and her husband (C.H.'s biological father(Joseph)); 3) M.C. indicated she was afraid of Joseph due to the violence, and respondent signed a family services protection plan provided by Social Services pledging to refrain from acts of domestic violence in front of the children; 4) respondent's pastor, Reverend Fisher, was called to respondent's house on one occasion where he witnessed several pieces of furniture damaged or destroyed by respondent. Because M.C. was very upset, Reverend Fisher kept her with his family for a few days; 5) on another occasion, M.C. was sent to stay with the Fishers overnight, and arrived with no undergarments even though the stay had been arranged in advance; 6) in March of 2001 M.C. told respondent that Joseph had tried to kiss her, that "it did not feel right" and that she did not like it. Respondent did not inquire of M.C. where Joseph attempted to kiss her, and only told M.C. that she should not let anyone kiss her if she did not like it. Respondent told M.C. that she would keep an eye on Joseph, and she tried not to leave M.C. alone with Joseph "for long." Respondent did not confront Joseph about the abuse; 7) in late summer of 2001, M.C. told respondent that Joseph had again come into her room while she slept, and that he had kissed her, touched her body, and attempted to hug her while she was trying to sleep. Respondent testified that she decided not to leave M.C. alone with Joseph because "she did not know what he was going to do . . . ." Respondent again failed to confront Joseph, but told M.C. that they would move away from Joseph. Respondent told M.C. not to tell anyone about the abuse; 8) respondent claimed that she attempted to take her children away from Joseph, but she could not find a ride; 9) in August of 2001, respondent began shouting obscenities in church and accusing Joseph of molesting M.C. She was escorted out of the church. In response to this outburst, Reverend Fisher visited respondent's home later that same day. Respondent refused to speak with him about the allegations, and he informed them he was contacting Social Services; 10) respondent again told her children she would take them away, but said "she could not get money together." She also reiterated her request to M.C. that she not tell anyone about the abuse, or M.C. would be taken away from her; 11) following Reverend Fisher's visit, Joseph again molested M.C. He confessed to respondent that he had touched M.C. and tried to kiss her. M.C. also told respondent of the abuse, and informed her that she was afraid Joseph might beat her ("break her back") if she told anyone. Respondent again promised to take M.C. away, but made no plans to do so. On that same day, Social Services interviewed M.C. and respondent and the children were taken to a friends house to stay; 12) respondent left the children at the friends house, and returned to stay with Joseph because she was concerned about him and could not get by withouthim; 13) respondent was with Joseph when she was asked to go to the police station for an interview, following which she was charged with three counts of felony child abuse for failing to protect M.C. from Joseph's sexual abuse (she subsequently pled guilty to three counts of committing an act where a juvenile could be abused (N.C. Gen. Stat. § 14-316.1) on 11 June 2002). Respondent denied she had done anything wrong. Respondent requested to be taken home so she could comfort Joseph, even though her children were staying with a friend and the social worker told her she should be comforting them; 14) after removing the children from respondent's care on 29 August 2001, respondent was observed walking hand in hand with Joseph; 15) Joseph confessed to taking indecent liberties with M.C. on 30 August 2001; 16) on 11 April 2002 Judge William G. Hamby, Jr. signed an order concluding respondent neglected both M.C. and C.H., and abused M.C. Judge Hamby further concluded that it was in the best interests of the children that they remain in the custody of Social Services, and that respondent submit to a mental health evaluation; 17) on 4 and 20 May 2002 respondent was evaluated by Laura Skinner, a licensed clinical psychologist, who found: a) Respondent's psychiatric problems began when she started hearing voices at age eleven, and she was diagnosed with schizophrenia. Respondent's mood appeared "unstable and her affect variable. During both sessions, her behaviors and speech shifted from animated and engaged, to depressed and tearful, to angry and paranoid . . . . As she becomes increasingly emotional, so does her thinking appear tobecome more distorted . . . . Her capacity for judgment and insight appear to be poor;" b) Skinner's evaluation reveals "an immature, impulsive and irresponsible woman who does not appear to have the psychological or physical resources to adequately care for herself or her children;" c) Skinner's prognosis was bleak, finding that due to respondent's "chronic history of instability, lack of independence, and poor judgment, prognosis is extremely guarded;" 18) outside of her plea to the criminal charges, respondent has refused to accept any responsibility for allowing the abuse to occur and continue; 19) respondent has lived with Joseph from the day he was released from prison, and was still residing with him on the date of the termination hearing; 20) respondent continued to hear voices, which she maintains are either from God or the Devil, and she has offered no proof that she has obtained any mental health treatment since 1992. Judge Johnson made further findings of fact in support of her conclusion that termination was in the best interest of the children showing they were adjusting well with their foster family, and that the family wished to adopt them both. From Judge Johnson's order terminating her parental rights, respondent appeals.
In the only assignment of error brought forward in her brief respondent argues the trial court's findings of fact were not supported by sufficient competent evidence. We disagree.
In the record on appeal, respondent asserted two assignments of error, quoted in full as follows:
1) The trial court's findings of fact were not supported by sufficient competent evidence.
2) The trial court's conclusions of law were not supported by the facts.
Respondent only argues the first assignment in her brief. It has long been held under the Rules of Appellate Procedure of this state and our case law that assignments of error such as those proffered by respondent above constitute a "broadside exception and [present] nothing for our consideration but the question whether the facts found support the judgment." Hicks v. Russell, 256 N.C. 34, 39, 123 S.E.2d 214, 218 (1961)(citing Putnam v. Triangle Publications, 245 N.C. 432, 96 S.E.2d 445 (1957); Kovacs v. Brewer, 245 N.C. 630, 97 S.E.2d 96 (1957); Merrell v. Jenkins, 242 N.C. 636, 89 S.E.2d 242 (1955)); see also In re Beasley, 147 N.C. App. 399, 405, 555 S.E.2d 643, 647 (2001). Under our Rules of Appellate Procedure, it is not enough merely to except to a judge's findings of fact, it is necessary to state why each disputed finding is claimed to be in error. Rule 10(c), N.C. Rules of Appellate Procedure; Alexvale Furniture, Inc. v. Alexander & Alexander, 93 N.C. App. 478, 482, 378 S.E.2d 436, 438 (1989). "When no assignment of error is made to particular findings, they are `presumed to be supported by competent evidence and are binding on appeal.'" First Union Nat'l Bank v. Bob Dunn Ford, Inc., 118 N.C. App. 444, 446, 455 S.E.2d 453, 454 (1995)(citing Anderson Chevrolet/Olds, Inc. v. Higgins, 57 N.C. App. 650, 653, 292 S.E.2d 159, 161 (1982)); see also In re Beasley, 147 N.C. App. 399, 555 S.E.2d 643 (2001).
In the instant case, respondent did not indicate in the record upon what bases she objected to specific findings of fact. Her assignment of error in the record thus constitutes a broadsideexception, is not sufficient to preserve any issue concerning the findings of fact, and thus the findings of fact are binding on appeal. The only issue preserved by respondent on appeal is the question of whether the findings of fact support the judgment. We hold that they do.
(a) The court may terminate the parental rights upon a finding of one or more of the following:
(1) The parent has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101.
N.C. Gen. Stat. § 7B-1111(a)(1)(2003). N.C. Gen. Stat. § 7B-101 (2003) defines abused and neglected juveniles:
(1) Abused juveniles. - Any juvenile less than 18 years of age whose parent, guardian, custodian, or caretaker:
d. Commits, permits, or encourages the commission of a violation of the following laws by, with, or upon the juvenile: . . . taking indecent liberties with the juvenile, as provided in G.S. 14-202.1, regardless of the age of the parties[.]
(15) Neglected juvenile. - A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, . . . or who is not provided necessary medical care; . . . or who lives in an environment injurious to the juvenile's welfare . . . . In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where . . . another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
Judge Johnson's findings of fact in the instant case, which are binding on this Court, clearly establish that M.C. and C.H. were neglected by respondent, and that M.C. was an abused juvenile. It is clear that respondent suffers from serious mental illness, that she is dependant on Joseph to such an extent that she places her relationship with him above her relationship with her children, that she knew of the sexual abuse M.C. suffered at the hands of Joseph, had the ability to prevent it, and did very little to protect her daughter. This abuse of M.C. was ongoing while C.H. was in the residence. Further, respondent had endangered C.H.'s life by taking him away from the hospital against a doctor's recommendation. Respondent does not accept responsibility for her neglect. The psychological evaluation ordered by the court expresses grave doubt as to respondent's ability to take responsibility and adequately protect her children in the future. Respondent continued to live with Joseph after her children were taken away from her, and was still living with him at the time of the termination hearing. The findings of fact in the instant case support Judge Johnson's conclusions of law and judgment. This assignment of error is without merit.
AFFIRMED.
Judges TYSON and BRYANT concur.
Report per Rule 30(e).